TAYLOR, C. J.
At issue in this case is whether repeated requests by police officers for defendant to come out of his apartment constituted constructive entry into his home for Fourth Amendment purposes, thereby invalidating his arrest without a warrant and rendering subsequently obtained evidence inadmissible. We conclude that even if we were to adopt the constructive entry doctrine recognized by several federal circuit courts of appeals, defendant in this case would fail to establish that the police constructively entered his home in violation of his Fourth Amendment right to privacy. Accordingly, we reverse the judgment of the Court of Appeals that held to the contrary and remand this case to the trial court for further proceedings consistent with this opinion.
I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE
Defendant’s alleged accomplice was arrested after at least twice selling drugs to an undercover officer. On the basis of information gathered during the drug transactions, the police learned that defendant (who was on probation) was on a tether in his apartment, and determined that they had probable cause to arrest defendant. On March 30, 2004, three plain clothes officers and two uniformed patrol officers drove to defendant’s apartment to effectuate the arrest. While one plain clothes officer, Officer Del Kostanko, watched the back terrace window in case defendant tried to flee, and one plain clothes officer, Officer Jerry Blow, stood behind a wall in the stairwell of the apartment building, *256 the remaining plain clothes officer, Officer Donald Bey, and the two uniformed officers approached the front door of defendant’s apartment and knocked.
Defendant testified that when the police knocked on the door, he checked to make sure his tether was not malfunctioning before he opened the door. He testified:
[T]he police asked me to come out, I told them: No, I couldn’t come out because I was on tether. We went back and forth. They kept telling me: Come out the door. I kept telling them: No, I’m on tether. We went back and forth, back and forth.
According to Officer Bey, the “back and forth” with defendant about coming out took place in a matter of seconds, and defendant was cooperative. Bey did not recall defendant saying that he could not come out of his apartment because of the tether. Officer Blow stated that while he only heard bits and pieces of the conversation, he did not hear defendant say he could not come out because he was on a tether. Defendant claimed he eventually came out of the apartment “because there was an officer to my right. There was something about it that made me feel threatened. So I came on out and they arrested me.” In any event, although he claimed that he was coerced, he admitted that he physically walked out of the apartment and that no officers touched him before he crossed the threshold.
Officer Bey testified that the entire arrest incident was calm, and no weapons were drawn. Officer Kostanko similarly testified that the arrest took place without incident and that defendant was cooperative. In contrast, when specifically asked, “Were people yelling, were people excited or was this fairly calm?” defendant testified that he “guessed” that the atmo *257 sphere was excited and it “could have been” excited.[1] Officers Kostanko and Bey both testified that after defendant was arrested, Kostanko entered the apartment at defendant’s request to get defendant’s coat and shoes. While inside, Officer Kostanko observed a piece of paper in plain view that contained the undercover officer’s undercover name and telephone number, and he confiscated it as evidence.
At the preliminary examination, defense counsel objected to admission of the piece of paper on the ground that he believed the police could not enter defendant’s apartment without a warrant. The preliminary examination was adjourned, and a suppression hearing was conducted, after which the trial court, evidently crediting defendant’s version of the events, concluded that defendant was coerced into leaving his apartment and granted defendant’s motion to suppress evidence of the piece of paper.[2]
*258 After the suppression hearing, the prosecutor moved to adjourn to allow him to consider whether to appeal the suppression decision. The trial court denied the motion. The next day, at what was to be the start of trial, the prosecutor cited the suppression decision along with the failure to obtain a plea from defendant’s accomplice and respectfully declined to proceed. The *259 trial court granted defense counsel’s motion to dismiss, but the dismissal was without prejudice.
The prosecutor appealed the suppression decision and the dismissal in the Court of Appeals, which affirmed in an unpublished opinion per curiam, issued April 4, 2006 (Docket No. 259122). The Court explained that (1) the evidence was suppressed not because it was seized without a search warrant but because defendant was arrested without an arrest warrant, and (2) while a warrant is not needed to arrest someone on probable cause outside the person’s home, a warrant is required, absent exigent circumstances, to arrest someone inside the person’s home. It phrased the issue as whether “the trial court had a reasonable evidentiary basis for concluding that the police actually coerced defendant to leave his place of residence and thus expose himself to [an arrest without a warrant].” Slip op at 2. After reciting defendant’s testimony, the Court of Appeals stated:
[The prosecutor] argues that defendant did not describe any actual coercion, but that he left the apartment voluntarily. However, defendant did describe his reluctance to leave because of his tether. The trial court credited this testimony, and observed that defendant was in a position to understand the implications of breaking that tether. Defendant additionally described a pattern of repeated police entreaties to leave the apartment. Such persistence on the part of uniformed police officers in response to defendant’s initial stated disinclination to leave the premises could reasonably be taken to constitute actual coercion. [Id.]
The prosecutor applied in this Court for leave to appeal. We granted leave to appeal, asking the parties to address, among the issues to be briefed, whether the police conduct “constituted a constructive entry into a citizen’s home for purposes of a Fourth Amendment search and seizure analysis.” 477 Mich 969 (2006).
*260 II. STANDARD OF REVIEW
The scope of the constructive entry doctrine and whether the police conduct in the instant case constituted a constructive entry of defendant’s dwelling raises Fourth Amendment implications. Issues of constitutional dimension are reviewed de novo. People v Drohan, 475 Mich 140, 146; 715 NW2d 778 (2006). A trial court’s factual findings are generally reviewed for clear error. People v Williams, 475 Mich 245, 250; 716 NW2d 208 (2006).
III. ANALYSIS
The Fourth Amendment of the United States Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. [US Const, Am IV]
In Payton v New York, 445 US 573; 100 S Ct 1371; 63 L Ed 2d 639 (1980), the United States Supreme Court held that the police were prohibited by the Fourth Amendment from entering a suspect’s home without a warrant or consent for the purpose of making an arrest. Id. at 576. In doing so, it noted that the amendment applied equally to seizures of persons and to seizures of property, and that the chief purpose was to protect against physical entry of the home. Id. at 587. The Court summarized:
In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent *261 circumstances, that threshold may not reasonably be crossed without a warrant. [Id. at 590.]
Hence, Payton prohibited only the actual physical entry by the police into a suspect’s home. Since Payton, however, the Sixth Circuit Court of Appeals has expanded the bar against actual physical entry to encompass situations involving constructive entry, which occurs when a suspect leaves his or her home in response to coercive police conduct. United States v Morgan, 743 F2d 1158, 1166 (CA 6, 1984). The Third, Ninth, and Tenth circuit courts of appeals have likewise recognized the doctrine of constructive entry. Sharrar v Felsing, 128 F3d 810, 819 (CA 3, 1997); United States v AlAzzawy, 784 F2d 890, 893 (CA 9, 1985); United States v Maez, 872 F2d 1444, 1450 (CA 10, 1989).
However, several other federal circuit courts of appeals have declined to adopt the doctrine, and the United States Supreme Court has yet to address the issue. United States v Carrion, 809 F2d 1120, 1128 (CA 5, 1987); United States v Berkowitz, 927 F2d 1376, 1386 (CA 7, 1991); Knight v Jacobson, 300 F3d 1272, 1277 (CA 11, 2002). Although state courts are bound by United States Supreme Court decisions construing federal law, they are not similarly bound by the decisions of the lower federal courts, and when there is a conflict of authority among the lower federal courts, this Court is free to follow the authority it deems the most appropriate. Abela v Gen Motors Corp, 469 Mich 603, 606; 677 NW2d 325 (2004). Indeed, even when there is no conflict among the lower federal courts, we are free to follow or reject their authority. Id. at 607.
Amicus curiae, the Prosecuting Attorneys Association of Michigan (PAAM), urges us to reject the constructive entry doctrine. It argues that (1) the United States Supreme Court has always held that probable *262 cause rather than a warrant is required for an arrest; (2) in Payton, supra, the Court held that a warrant was required not to accomplish the arrest, but rather to invade the privacy of the dwelling; and (3) Morgan and its progeny have erred in focusing on arrests without a warrant when the concern expressed in Payton was the crossing of thresholds without a warrant. However, we need not decide whether to adopt the constructive entry doctrine in this case because, even assuming that the constructive entry doctrine applies, we conclude that defendant here has not established that the police constructively entered his apartment in violation of his Fourth Amendment right to privacy.
Unlike the siege tactics employed in Morgan, supra at 1161, 1164, namely the encircling of the suspect’s house with nine officers and several patrol cars, the strategic blocking of the suspect’s car with one of the patrol cars, and the use of floodlights and a bullhorn in the dark of night to summon the suspect from the home, the actions of the officers in the instant case, according to defendant himself, merely involved knocking on his front door and asking him to step outside.[3]
Similarly, the facts of this case do not approach those of United States v Saari, 272 F3d 804, 806-807 (CA 6, 2001), in which four officers, with weapons drawn, surrounded the only entrance to the defendant’s apartment, one officer carried a shotgun, and the officers announced, “Police.” When the defendant opened the door, he was instructed to come outside. He testified that he walked outside with his hands in the air because he was afraid of being shot. In suppressing the evidence seized incident to the arrest, the Saari court gave *263 several examples of situations in which a reasonable person would not believe that he or she was free to leave:
“[T]he threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer’s request might be compelled.” [Id. at 808, quoting United States v Mendenhall, 446 US 544, 554; 100 S Ct 1870; 64 L Ed 2d 497 (1980).]
In the instant case, while there was one more officer at the scene than in Saari, there was one less officer at defendant’s door, and there is no indication that defendant knew of the presence of the other two officers at the time he left the apartment. Of the three officers at his door, only two were in uniform. This did not constitute an overwhelming show of force. Further, there was no evidence that the officers drew their weapons or used language that indicated that defendant might be compelled to leave his apartment, and defendant specifically testified that they did not touch him until after he crossed the threshold.
Nor did the officers’ behavior approach that of the officers in Al-Azzawy, supra at 893 (the police completely surrounded the trailer with weapons drawn and, with a bullhorn, ordered the suspect to leave the trailer and drop to his knees), or Sharrar, supra at 819 (the police surrounded the house, pointed machine guns at the windows, and ordered the suspects to come out). Each of those cases involved overbearing police tactics.
Here, rather, the officers acted consistently with those in United States v Thomas, 430 F3d 274, 276 (CA 6, 2005), in which four officers approached the suspect’s house in the daytime, two at the front door and two at the back door (which served as the primary entrance to *264 the house), while one officer stayed in a patrol car; the two who approached the primary entrance knocked, asked the suspect to step outside when he answered the door, and arrested him when he refused to speak with them. The Sixth Circuit found no Fourth Amendment violation because “the police officers did not enter the house and . .. defendant. .. did not exit the house as a result of physical force or any other conspicuous show of authority by the police.” Id. at 275.
The court noted that consensual encounters between the police and citizens were permitted, and they did not become nonconsensual merely because they took place at the entrance of someone’s home. Id. at 277. The court explained that the difference between a consensual encounter and a constructive entry is the show of force by the police. Id.
Lastly, the court reasoned that the number of officers present did not always indicate coercion; in finding that four officers was reasonable, the court noted the potential danger of approaching a house believed to contain a drug operation and stated that the officers were permitted to take reasonable security precautions. Id. at 280. Similarly here, the three officers approached defendant’s apartment to arrest him for conspiracy to deliver controlled substances. While one of the officers testified that he did not expect to find evidence of drug trafficking in the apartment because defendant was on probation and, thus, was subject to random searches by his probation officer, the potential for danger still existed, and the officers reasonably sent three officers to defendant’s door.
Moreover, while defendant claims he was coerced into leaving his apartment by the repeated requests of the officers, he fails to indicate how a second request that he step out of the apartment is any more coercive than *265 a single request. And, as noted in Thomas, an officer’s request that an individual step out of his house to speak with the officer is not coercive. Additionally, defendant failed to identify any specific statements of compulsion. Compare, for example, the case of Boykin v Van Buren Twp, 479 F3d 444 (CA 6, 2007), in which the circuit court noted in a footnote that if the plaintiff had brought a claim alleging violation of his Fourth Amendment rights as a result of a constructive entry by the police, instead of bringing a civil rights action under 42 USC 1983, he likely would have had considerably more success. Id. at 450 n 2. In doing so, it found the following comments demonstrated an unequivocal show of force, “ ‘I’m trying to avoid coming into your home and dragging you out of your home.... And we’re going to do that if you don’t listen to us.’ ” Id. The statements in Boykin indicate that had the suspect not complied, the police would have physically compelled his compliance. In contrast here, defendant merely testified that the “Police said come out.... They kept telling me to come out the door.” These statements do not threaten the use of physical force to compel compliance or, in fact, threaten in any manner.[4]
Although this case is somewhat complicated by the fact that defendant wore a tether and initially refused to leave the apartment, the suspect in Boykin apparently also refused to leave his home. While the tether *266 may have given defendant a greater incentive to stay in his apartment, this alone does not lead to a presumption that defendant’s will was overborne by a show of police force. Rather, the tether, backed by a court order to remain in the apartment, instead of supplying a basis for a reasonable person to have felt coerced to leave his apartment as claimed by the dissent, would seem to provide more resolve to the person wearing it to remain inside. In other words, armed with a court order, defendant should have felt reasonably confident in refusing police requests that he leave the apartment. Thus, with the caselaw we have discussed in mind, it being clear that there was no improper entry, constructive or otherwise, defendant was arrested legally, and the trial court erred in suppressing evidence of the piece of paper containing the undercover officer’s name and telephone number.
IV CONCLUSION
In summary, even if we were to recognize the constructive entry doctrine, defendant in this case would fail to establish that police constructively entered his home in violation of his Fourth Amendment right to privacy. Accordingly, we reverse the judgment of the Court of Appeals and remand this case to the trial court for proceedings consistent with this opinion.
Reversed and remanded to the trial court.
Corrigan, Young, and Markman, JJ., concurred with Taylor, C.J.

 The dissent claims that “[t]he uniformed police officers created an excited and coercive atmosphere,” post at 276, that the instant facts “reveal excited, repeated demands for a person under house arrest to leave his residence,” id. at 277, and that this establishes the coercive conduct necessary to find constructive entry. However, as clearly indicated from the testimony of the officers and not unequivocally repudiated by defendant himself, the atmosphere regarding the encounter at defendant’s apartment door was calm.

 The dissent claims that the trial court did not clearly err when it found that an excited atmosphere existed. Contrary to the dissent’s version of events, while the trial court credited defendant’s version of events, defendant never unequivocally stated that there was an excited atmosphere, and the trial court did not explicitly find that there was an excited atmosphere. Rather, the trial court stated:
Well, I listened to the evidence and ... what is before the Court is this arrest which really troubles me. These officers had an address, had a name. They knew what the gentleman looked like. They went there, and I think they found it more expeditious than appropriate to just go there and arrest him on this probable cause they had from Officer Tran, who wasn’t even present at the time *258 of the arrest.... I believe they were told by Mr. Gillam: Look, I’m on tether. The gentleman has a record. He has a record here as long as my arm. So he certainly is familiar with the system. And I’m certain he knows the meets [sic] and bounds of a tether system. And he knows he was told, apparently he was told, he said he didn’t want to step outside. He was somehow or other — the officers say he really steps outside. I find that hard to believe. In any event, 1 think he was, in some manner or another, caused to step outside and be arrested. (Emphasis added.)
Thus, there was no “finding” of an excited atmosphere and, accordingly, any assessment of trial court error, much less clear error, in a “finding” the court never made is not possible.
Nevertheless, the dissent also claims that the “trial court’s finding that there was a coercive environment was not clearly erroneous, given the quantity and weight of the testimony that supported it.” Post at 275 n 12. If, as the dissent contends, id., the trial court “explicitly” found there was a coercive environment when it stated, “He was somehow or other — the officers say he really steps outside. I find that hard to believe. In any event, I think he was, in some manner or another, caused to step outside and be arrested,” the trial court’s conclusion would be clearly erroneous because the finding was contrary to the testimony of the officers as well as defendant. As previously noted, the officers essentially testified that defendant was cooperative and stepped outside when asked, and defendant himself acknowledged that he physically walked out of the apartment and that no officers touched him before he crossed the threshold. Moreover, defendant could not identify any specific statement or action by an officer that would indicate coercion; rather, he testified generally that the officers kept telling him to come outside, and that something about the officer standing to his right made him feel threatened. To the extent the trial court found that the officers created a coercive environment, the clear error in such finding is apparent where the trial court itself was unable to articulate how the officers’ actions or statements were coercive.

 Although there were five officers at the scene, defendant testified that there were only three at his front door at the time he opened it.

 The dissent claims that we have missed a crucial part of the dicta in Boykin that “recognized that coercive statements alone could invoke the constructive entry doctrine.” Post at 278. We reiterate that we have not yet decided whether to adopt the constructive entry doctrine in Michigan. Even assuming arguendo that the constructive entry doctrine as articulated by the Sixth Circuit in Boykin were to apply, however, no coercive statements were made in this case. It is, therefore, unnecessary to decide whether coercive statements alone can invoke the constructive entry doctrine.